FILED

APR 21 2011

AT_____ O'CLOCK
Lawrence K. Baerman, Clerk - Syracuse

U.S. DISTRICT COURT - N.D. OF N.Y.

### UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**UNITED STATES OF AMERICA,**

**v.**

**(1) SAQUAN EVANS, a/k/a "Quazy," "Quan,"**
   **"Quaz," "Quanny," "Masaroti," and "Moto,"**
**(2) JARRELL WILLIAMS, a/k/a "Rugga," "Rel,"**
   **and "Ruggarel,"**
**(3) DEMETRIUS SULLIVAN, a/k/a "Meechie,"**
**(4) DARNELL WILLIAMS, a/k/a "Styles,"**
**(5) MATTHEW CHEEK, a/k/a "Cheeks,"**
**(6) MIQUAN RUSSO, a/k/a "Shyce,"**
**(7) SHAWNTELL RUSH, a/k/a "Sparks," and "Tells,"**
**(8) AMADIS HUNTER, a/k/a "Baldy,"**
**(9) ERNEST HESTER, a/k/a "EB,"**
**(10) JAYCEE FLOYD, a/k/a "Mojo" and "Mojesus,"**
**(11) JEROME CLARKE, a/k/a "Loonz,"**
**(12) ANTHONY BRASWELL, a/k/a "Pooper," and**
**(13) MIGUEL RUSSO, a/k/a "G-Money," "Gell,"**
   **and "Funny,"**

**Defendants.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**No. 5:11-CR-198 (NAM)**

**INDICTMENT**
**Vio: 18 U.S.C. § 1962(d)**

### THE GRAND JURY CHARGES:

### COUNT ONE

### THE ENTERPRISE

At all times material to this Indictment:

1.    Defendants:

**SAQUAN EVANS, a/k/a "Quazy," "Quan,"  "Quaz,"**
**"Quanny," "Masaroti," and "Moto,"**
**JARRELL WILLIAMS, a/k/a "Rugga," "Rel," and "Ruggarel,"**
**DEMETRIUS SULLIVAN, a/k/a "Meechie,"**
**DARNELL WILLIAMS, a/k/a "Styles,"**
**MATTHEW CHEEK, a/k/a "Cheeks,"**

MIQUAN RUSSO, a/k/a "Shyce,"
SHAWNTELL RUSH, a/k/a "Sparks," and "Tells,"
AMADIS HUNTER, a/k/a "Baldy,"
ERNEST HESTER, a/k/a "EB,"
JAYCEE FLOYD, a/k/a "Mojo" and "Mojesus,"
JEROME CLARKE, a/k/a "Loonz,"
ANTHONY BRASWELL, a/k/a "Pooper," and
MIGUEL RUSSO, a/k/a "G-Money," "Gell," and "Funny,"

and others, were members and associates of a criminal organization in Syracuse, New York, known as the "Bricktown Gang," whose members and associates engaged in acts involving murder, robbery, and drug trafficking, within the Northern District of New York and elsewhere.

2.      The Bricktown Gang, including its leadership, members, and associates, constituted an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact. The enterprise was engaged in, and its activities affected, interstate and foreign commerce. The enterprise was an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## PURPOSES OF THE ENTERPRISE

3.      The purposes of the Bricktown Gang included, but were not limited to, the following:

      a.      Enriching the members of the Bricktown Gang through, among other things, control of and participation in the distribution of controlled substances in Bricktown Gang territory and elsewhere;

      b.      Maintaining control over Bricktown Gang territory;

      c.      Preserving, protecting, and expanding the power and reputation of the Bricktown Gang through the use of intimidation, violence, threats of violence, robberies, assaults, attempted murders, and murders; and

     d.     Promoting and enhancing the Bricktown Gang, its activities, and the activities of its members and associates; and

     e.     Exposing and pressuring Bricktown Gang members who cooperate with law enforcement.

### MANNER AND MEANS OF THE ENTERPRISE

4.     The Bricktown Gang operated in a multi-block area on the south side of the City of Syracuse, New York. The borders of this territory were Burt Street to the north, South State Street to the west, East Colvin Street to the south, and Interstate Route 81 to the east. ("Bricktown Gang territory"). While this is considered the core area for the Bricktown Gang, the gang also exerted some degree of influence and control beyond the northern border of their territory, which was where the Pioneer Homes housing project was situated.

5.     One of the principal activities of the Bricktown Gang and its members was the sale of controlled substances. By 2000, the distribution of cocaine and crack cocaine (cocaine base) within the territory was a common occurrence, with multiple major dealers being the primary suppliers to the lower ranking, younger gang members. These major suppliers obtained their cocaine and crack cocaine (cocaine base) from New York City and elsewhere. The lower level dealers, usually around 15 to 16 years old, would break the cocaine and crack cocaine (cocaine base) down into individual doses and sell them to "licks," which is a slang term used to describe customers who came into the territory to buy drugs. As Bricktown Gang members became more successful at selling drugs, they elevated their status by purchasing larger quantities and selling to younger members. When the younger members sold the cocaine and crack cocaine (cocaine base), they kept a portion of the proceeds as a profit for themselves and used the balance to buy more  cocaine and

crack cocaine from the upper level dealers.  The upper level dealers, in turn, took the money they received from the younger associates and purchased more drugs to continue the drug-dealing cycle.

6.      This cycle of drug dealing continued virtually unabated since at least 2000, even as multiple gang members were killed on the streets or went to prison for gun, drug, and violent crime violations.  The structure of Bricktown Bang members maintaining exclusive control over their territory, in large part to protect their ongoing drug trade, endured despite the killings and the arrests. Several of the more senior members also dealt larger quantities of cocaine and cocaine base (crack) outside the territory.

7.      Bricktown Gang members guarded Bricktown Gang territory to prevent drug sales by others in the territory or encroachment of any kind by rival gang members.  If a non-Bricktown member was detected or attempted to sell drugs within Bricktown territory, either on his own, or in conjunction with a rival gang, he would be summarily dismissed from the area and, likely, physically assaulted, stabbed, or shot.  Additionally, any rival gang member who passed through Bricktown Gang territory, even if he was not selling or attempting to sell drugs, was subject to attacks to ensure that the territory remained firmly under Bricktown Gang control.

8.      There are several features of the Bricktown Gang that remained constant throughout the years:

a.      Bricktown Gang members used the safety and sanctuary of the gang territory as much as possible to make drug sales, to possess drugs, to meet and congregate as a gang to discuss gang related issues such as retaliating against rival gangs, and to hide from police and rival gangs. One of the places within the Bricktown Gang territory where Bricktown Gang members routinely congregated was Libba Cotton Park, a small park area in the middle of gang territory.

4

b.      Bricktown Gang members who happened to be in the area at the time of an encroachment by a rival gang member or an unwanted drug dealer would routinely respond with violence to protect the territory. Sometimes these responses were coordinated amongst Bricktown Gang members.

c.      Bricktown Gang members routinely wrote gang-related graffiti on the buildings in their territory. Such graffiti was in the form of the words "Bricktown," "Brick City," or "Brickset," or in the numbers "252," which meant gang members are willing to do 25 years to life in prison to support the gang. Such graffiti was quickly taken off the buildings by the housing project maintenance staff, but that did not deter gang members from regularly placing new graffiti on the buildings.

d.      Bricktown Gang members on occasion used hand signs to represent gang identity. The primary Bricktown Gang hand sign was made by extending the thumb and pinkie finger outward while folding the three middle fingers inward.

e.      Bricktown Gang members sometimes wore royal blue colored "flags" or bandannas to indicate to others that they were associated with the Bricktown gang.

f.      Bricktown Gang members routinely armed themselves with firearms in order to protect their territory, to protect their drug trade, to project a violent attitude to rival gang members, and to retaliate against any rival gangs who committed acts of violence against Bricktown Gang members. Bricktown Gang members secreted guns at various locations within gang territory so that they were readily available for gang members to use when necessary. These guns were routinely used by Bricktown Gang members to shoot at rival gang members both within Bricktown Gang territory and elsewhere.

g.    Bricktown Gang members had long-standing feuds with other street gangs, such as the 110 and East Side gangs, and more recently, the V-NOT Gang. These feuds resulted in numerous murders and attempted murders of the rival gang members. Bricktown Gang members often used their gang guns to conduct drive-by shootings in rival gang territories in furtherance of these gang wars. On occasion, innocent bystanders were caught in the cross-fire, the most recent example of which is the shooting death of a 20-month old toddler, who was killed as he sat in his car seat in a van.

h.    Bricktown Gang members routinely used the terms "word to L," which was a tribute to slain gang associate Larry Lewis, "word to OJ" or "word Mel," which was a tribute to slain Bricktown Gang member Tyrrell Barner, and "word to Pretty," which was a tribute to slain Bricktown Gang member Ricky Washington, to signify their affiliation with the gang.

9.    More recently, Bricktown Gang members, and those associated with them, utilized the Facebook web site to glorify and perpetuate the Bricktown Gang through photos, writings and drawings.

10.    Some Bricktown Gang members wrote substantial rap lyrics that glorified the Bricktown Gang, as well as graphically described the drug dealing, gun use, and violence by its members.

11.    Bricktown Gang members, especially in the earlier years, generally had a familial affiliation with a current gang member, lived in the gang territory at some point, and demonstrated a propensity to do one or more of the following: (1) engage in drug trafficking; (2) protect the gang territory, (3) engage in gang-related violence; and/or (4) retaliate against rival gangs for acts of violence or disrespect perpetuated by rival gangs, even if that individual gang member was not the

subject of the violence and disrespect. Bricktown Gang members gained stature in the gang by demonstrating a proficiency in one or more of these areas.

12.    The Bricktown Gang continued to operate as a criminal enterprise despite attrition caused when members were incarcerated for criminal offenses, left the gang, or were killed. Rival gang members and others were aware of its continued existence, protection of its territory, and criminal operations despite that attrition.

## THE RACKETEERING CONSPIRACY

From at least 2000, the exact date being unknown to the grand jury, and continuing thereafter up to the date of the indictment, in the Northern District of New York and elsewhere, the defendants,

**SAQUAN EVANS, a/k/a "Quazy," "Quan," "Quaz,"
"Quanny," "Masaroti," and "Moto,"
JARRELL WILLIAMS, a/k/a "Rugga," "Rel," and "Ruggarel,"
DEMETRIUS SULLIVAN, a/k/a "Meechie,"
DARNELL WILLIAMS, a/k/a "Styles,"
MATTHEW CHEEK, a/k/a "Cheeks,"
MIQUAN RUSSO, a/k/a "Shyce,"
SHAWNTELL RUSH, a/k/a "Sparks," and "Tells,"
AMADIS HUNTER, a/k/a "Baldy,"
ERNEST HESTER, a/k/a "EB,"
JAYCEE FLOYD, a/k/a "Mojo" and "Mojesus,"
JEROME CLARKE, a/k/a "Loonz,"
ANTHONY BRASWELL, a/k/a "Pooper," and
MIGUEL RUSSO, a/k/a "G-Money," "Gell," and "Funny,"**

together with others known and unknown to the grand jury, being persons employed by and associated with the enterprise known as the Bricktown Gang, described in paragraphs 1 through 12 of this indictment, which enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully, knowingly, and intentionally did combine, conspire, confederate, and agree together and with each other and with others known and unknown to the grand jury, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and

indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple acts involving: (1) murder, in violation of New York Penal Law Sections 125.25, 110.05, and 105.17; (2) robbery, in violation of New York Penal Law Sections 160.05, 160.10, and 160.15; and (3) conspiracy to possess with intent to distribute cocaine base (crack), cocaine, and marijuana, as well as possession with intent to distribute and distribution of cocaine base (crack), cocaine and marijuana, in violation of Title 21, United States Code, Sections 841(a) and 846.

It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

### OVERT ACTS[1]

In furtherance of the conspiracy and in order to affect the objects thereof, the defendants and their co-conspirators, known and unknown to the grand jury, committed and caused to be committed the following overt acts, among others, in the Northern District of New York and elsewhere:

1. On or about October 15, 2003, **SHAWNTELL RUSH,** while in the company of fellow Bricktown Gang members, possessed a .38 caliber handgun in a vehicle in the 100 block of East Kennedy Street, Syracuse.

2. On or about March 2, 2004, **MATTHEW CHEEK** was involved in a drive-by shooting in the 400 block of Bellevue Avenue, Syracuse.

---

[1] The a/k/a's ("also known as") for each of the defendants are not restated in the Overt Acts section.

3. On or about July 2, 2004, **MATTHEW CHEEK, SHAWNTELL RUSH**, and others were involved in a knife-point robbery of a store owner in the 200 block of Oakwood Avenue, Syracuse.

4. On or about November 7, 2004, **SHAWNTELL RUSH** possessed a stolen handgun in the 100 block of East Raynor Avenue, Syracuse.

5. On or about August 1, 2005, **AMADIS HUNTER** and **ERNEST HESTER** shot at three persons in the 500 block of West Colvin Street, Syracuse using two 9 mm handguns.

6. On or about March 4, 2006, **SAQUAN EVANS** possessed a handgun in the 200 block of Oakwood Avenue, Syracuse.

7. On or about October 7, 2006, **AMADIS HUNTER** shot at occupants of a passing vehicle in the 1300 block of South State Street, Syracuse.

8. On or about October 11, 2006, **AMADIS HUNTER** possessed a .38 caliber handgun and a .45 mm handgun in connection with a shooting in the vicinity of 123 Weiser Court, Syracuse.

9. On or about October 19, 2006, **ERNEST HESTER** possessed ten bags of cocaine base (crack) in the 100 block of Beard Avenue, Syracuse.

10. On or about November 7, 2006, **SAQUAN EVANS** was involved in a shooting in the vicinity of 1300 South State Street, Syracuse.

11. On or about November 15, 2006, **JEROME CLARKE**, while with **SAQUAN EVANS, ERNEST HESTER, JARRELL WILLIAMS,** and others, possessed a 9 mm handgun in the 200 block of Baker Avenue, Syracuse.

12. On or about September 4, 2007, **JARRELL WILLIAMS** shot a rival gang member in the back in the 1000 block of Cannon Street in Syracuse.

9

13.     On or about September 4, 2007, **ERNEST HESTER** drove a vehicle into a position that allowed front seat passenger **JARRELL WILLIAMS** to shoot and kill Anthony Ford, and shoot in the head a female who was with Ford, in the 1600 block of East Fayette Street, Syracuse.

14.     On or about January 8, 2008, **JARRELL WILLIAMS** possessed a .380 caliber handgun in the 1300 block of South State Street, Syracuse.

15.     On or about October 27, 2008, **JAYCEE FLOYD** possessed five bags of cocaine base (crack) cocaine in the 100 block of Dablon Court, Syracuse.

16.     On or about December 13, 2008, **JARRELL WILLIAMS**, **MATTHEW CHEEK, SHAWNTELL RUSH, ERNEST HESTER,** and **DEMETRIUS SULLIVAN** were together in vehicle at 1400 Erie Blvd. West in Syracuse, which contained a 9 mm handgun and .45 caliber handgun.

17.     On or about September 4, 2009, **DARNELL WILLIAMS** possessed approximately 8 grams of cocaine base (crack) and $622 in U.S. currency in the 2400 block of Erie Blvd. East, Syracuse.

18.     On or about January 4, 2010, **MIGUEL RUSSO** and **JARRELL WILLIAMS** possessed a handgun in connection with a shooting in the 100 block of Ballantyne Road, Syracuse.

19.     On or about July 19, 2010, **ANTHONY BRASWELL** possessed approximately 20 grams of cocaine base (crack) in the 100 block of Mulberry Terrace, Syracuse.

20.     On or about August 24, 2010, **DARNELL WILLIAMS** possessed approximately 4 grams of cocaine base (crack) and $470 in U.S. currency in the 1300 block of South State Street, Syracuse.

21.     On or about August 24, 2010, **DARNELL WILLIAMS** possessed approximately 7 grams of cocaine base (crack) at 105 Gaynor Avenue, Syracuse.

22.     On or about November 7, 2010, **SAQUAN EVANS** shot four rival gang members in a garage at 321 Shirley Drive, Syracuse.

23.     On or about November 13, 2010, **MIQUAN RUSSO** sold approximately 7 grams of cocaine base (crack) to a customer in Syracuse.

24.     On or about November 28, 2010, **SAQUAN EVANS** shot and killed Rashad Walker, Jr., a 20-month old child, by firing bullets from a handgun into a minivan used by a rival gang member in the 300 block of Coolidge Avenue, Syracuse.

25.     On or about November 29, 2010, **SAQUAN EVANS** possessed a Bricktown Gang roster, gang paraphernalia, and rap lyrics related to the Bricktown Gang at his home in Syracuse.

26.     On or about December 17, 2010, **DEMETRIUS SULLIVAN** and **MIGUEL RUSSO** were with **MIQUAN RUSSO** when **MIQUAN RUSSO** sold approximately 10 grams of cocaine base (crack) to a customer in Syracuse.

27.     On or about January 1, 2011, **JAYCEE FLOYD** possessed a black handgun at 1226 South State Street, Syracuse.

28.     On or about January 3, 2011, **AMADIS HUNTER** was with **MIQUAN RUSSO** when **RUSSO** sold approximately 11 grams of cocaine base (crack) to a customer in Syracuse.

29.     On or about January 14, 2011, **DEMETRIUS SULLIVAN** and **MIGUEL RUSSO** were with **MIQUAN RUSSO** when **MIQUAN RUSSO** sold approximately 18 grams of cocaine base (crack) to a customer in Syracuse, New York.

30.     On or about January 27, 2011, **JARRELL WILLIAMS, MIGUEL RUSSO,** and

**DEMETRIUS SULLIVAN** were with **MIQUAN RUSSO** when **MIQUAN RUSSO** sold

approximately one ounce of cocaine base (crack) to a customer in Syracuse, New York.

31.     On or about January 30, 2011, **ERNEST HESTER, JEROME CLARKE,**

**ANTHONY BRASWELL, JAYCEE FLOYD,** and others participated in a gang assault stabbing

of four persons inside a restaurant at 3414 Erie Blvd. East, Dewitt, New York.

32.     On or about February 10, 2011, **MIQUAN RUSSO** sold approximately one ounce

of cocaine base (crack) to a customer in Syracuse.

## SPECIAL SENTENCING ALLEGATIONS

**The Grand Jury further alleges that:**

1.      From at least 2000, the exact date being unknown to the grand jury, and continuing

thereafter up to the date of the indictment, in the Northern District of New York and elsewhere, the

defendants,

> **SAQUAN EVANS, a/k/a "Quazy," "Quan," "Quaz,"**
> **"Quanny," "Masaroti," and "Moto,"**
> **JARRELL WILLIAMS, a/k/a "Rugga," "Rel," and "Ruggarel,"**
> **DEMETRIUS SULLIVAN, a/k/a "Meechie,"**
> **DARNELL WILLIAMS, a/k/a "Styles,"**
> **MATTHEW CHEEK, a/k/a "Cheeks,"**
> **MIQUAN RUSSO, a/k/a "Shyce,"**
> **SHAWNTELL RUSH, a/k/a "Sparks," and "Tells,"**
> **AMADIS HUNTER, a/k/a "Baldy,"**
> **ERNEST HESTER, a/k/a "EB,"**
> **JAYCEE FLOYD, a/k/a "Mojo" and "Mojesus,"**
> **JEROME CLARKE, a/k/a "Loonz,"**
> **ANTHONY BRASWELL, a/k/a "Pooper," and**
> **MIGUEL RUSSO, a/k/a "G-Money," "Gell," and "Funny,"**

and others known and unknown to the Grand Jury, combined, conspired, confederated, and agreed with each other to knowingly and intentionally distribute 50 grams or more of cocaine base (crack cocaine), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); all in violation of Title 21, United States Code, Section 846.

2.    On or about September 4, 2007, in the Northern District of New York, defendants **JARRELL WILLIAMS** and **ERNEST HESTER** committed an act involving murder, to wit, with the intent to cause the death of another person, they caused the death of such person, Anthony Ford, in violation of New York Penal Law Section 125.25(1).

3.    On or about November 28, 2010, in the Northern District of New York, defendant **SAQUAN EVANS** committed an act involving murder, to wit, under such circumstances evincing a depraved indifference to human life, he recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused the death of another person, Rashad Walker, Jr., in violation of New York Penal Law Section 125.25(2).

All in violation of Title 18, United States Code, Section 1962(d).

Dated:  April 21, 2011                               A TRUE BILL,

RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

By:
    John M. Katko
    Assistant U.S. Attorney
    Bar Roll No. 502457

13

and others known and unknown to the Grand Jury, combined, conspired, confederated, and agreed with each other to knowingly and intentionally distribute 50 grams or more of cocaine base (crack cocaine), in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A); all in violation of Title 21, United States Code, Section 846.

      2.     On or about September 4, 2007, in the Northern District of New York, defendants **JARRELL WILLIAMS** and **ERNEST HESTER** committed an act involving murder, to wit, with the intent to cause the death of another person, they caused the death of such person, Anthony Ford, in violation of New York Penal Law Section 125.25(1).

      3.     On or about November 28, 2010, in the Northern District of New York, defendant **SAQUAN EVANS** committed an act involving murder, to wit, under such circumstances evincing a depraved indifference to human life, he recklessly engaged in conduct which created a grave risk of death to another person, and thereby caused the death of another person, Rashad Walker, Jr., in violation of New York Penal Law Section 125.25(2).

      All in violation of Title 18, United States Code, Section 1962(d).

Dated:  April 21, 2011

A TRUE BILL,   *Name Redacted

FOREPERSON

RICHARD S. HARTUNIAN
UNITED STATES ATTORNEY

By:

John M. Katko
Assistant U.S. Attorney
Bar Roll No. 502457

13